

ELECTRONICALLY FILED
7/9/2018 1:48 PM
70-CV-2018-900105.00
CIRCUIT COURT OF
TALLAPOOSA COUNTY, ALABAMA
PATRICK CRADDOCK, CLERK

## IN THE CIRCUIT COURT FOR TALLAPOOSA COUNTY, ALABAMA
## ALEXANDER CITY DIVISION

| | | |
|---|---|---|
| PRICARE, P.A., and TEMPLE MEDICAL CLINIC, P.C., | ] ] ] | |
| Plaintiffs, | ] ] | |
| v. | ] ] ] | **CIVIL ACTION**<br>**CASE NO. _____** |
| STERICYCLE, INC. and FICTITIOUS DEFENDANTS ONE THROUGH TWENTY, whose names and identities are otherwise unknown to the Plaintiff but whose true names will be substituted by amendment when they are ascertained, and who are further described in Paragraph 7 of this complaint, | ] ] ] ] ] ] ] ] ] ] ] | **JURY TRIAL DEMANDED** |
| Defendants. | ] ] | |

### COMPLAINT

PriCare, P.A. ("PriCare") and Temple Medical Clinic ("Temple," and, collectively, "Plaintiffs") state the following as their complaint against Defendant Stericycle, Inc. ("Stericycle" or "Defendant"):

### INTRODUCTION

1.     The Complaint is brought for violation of Illinois's Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1 *et seq.*, and its Uniform Deceptive Trade Practices Act (the "IDTPA"), codified at 815 ILCS § 510/1 *et seq.*, fraud, breach of contract, unjust enrichment, and money had and received.

2.     The Illinois Consumer Fraud and Deceptive Business Practices Act forbids "the use or employment of any deception, fraud, false pretense, false

promise, misrepresentation or the concealment, suppression or omission of any material fact" in the conduct of any trade or commerce. 815 ILCS § 505/2. The IDTPA similarly makes unlawful deceptive acts or practices in the conduct of any trade or commerce, including "[e]ngaging in any other conduct which ... creates a likelihood of confusion or misunderstanding." 815 ILCS § 510/2(a)(12).[1]

3.     Stericycle's acts and practices in dealing with PriCare and Temple were intentionally structured to create confusion and misunderstanding on Plaintiffs' part. Among other practices, Stericycle enters into long-term "fixed rate" contracts with its customers which it claims will control costs and can be adjusted only for a very limited number of reasons such as regulatory changes imposing additional costs. Notwithstanding such representations, Stericycle arbitrarily charges its customers ever-escalating amounts through automated price increases that are without any justification of any kind. When customers discover these issues and protest and/or cancel their service, they are punished with liquidated damages provisions in their contracts and a series of contractual terms that are unreasonably favorable to Stericycle and are oppressive, one-sided, unconscionable, and patently unfair. The liquidated damages terms are only possible because of the unequal bargaining power among the parties and the lack of meaningful choice in the regulated medical waste industry.

---

[1] *See Unique Concepts, Inc. v. Manuel*, 669 F. Supp. 185, 191 (N.D. Ill. 1987) ("Any conduct in a business which creates a likelihood of consumer confusion or misunderstanding is potentially actionable.").

## PARTIES

4.　PriCare is an Alabama professional association, with its principal place of business in Tallapoosa County, Alabama. PriCare is a large, multi-specialty medical clinic offering family healthcare, gynecology, and occupational medicine for individuals over 5 years old. PriCare has to dispose of medical waste collected in the course of the operation of its laboratories.

5.　Temple is an Alabama professional corporation, with its principal place of business in Tallapoosa County, Alabama. Temple is a multi-purpose medical clinic that has been providing health services to the Alexander City area for 50 years, with its main practice areas including general medicine, office surgery, pediatrics, and industrial services. Temple also has to dispose of medical waste collected in the course of the operation of its laboratories.

6.　Stericycle, Inc. is a Delaware corporation with a principal place of business located at 28161 North Keith Drive, Lake Forest, Illinois. Its registered agent in Alabama is CT Corporation System, 2 North Jackson St., Suite 605, Montgomery, AL 36104.

7.　Fictitious Defendants are described as follows: Defendants 1-20, being the correct legal description of those entities described in the style of this cause and/or the correct legal description of that or those entities doing business with Plaintiffs as "Stericycle."

8.　Stericycle describes itself as a "global business-to-business solutions provider." Its customers' industries are "healthcare, pharmacies & retail, biotech, manufacturing, professional services, governments." Its "[c]ontracts generally

31589487 v1                     3

include pass through price increase provisions" and it focuses on small customers because "[s]mall account customers generate gross margins higher than large account customers" and "[s]mall account customers are more likely to outsource and are easier to up-sell."

9.    For years, Stericycle generated its nearly $3 billion in annual revenues by programming its internal billing and accounting software to automatically charge an 18% annual price increase in the flat rates charged to its customers. In 2015, Stericycle had $2.99 billion in revenue and GAAP gross profit of $1.27 billion. At all times material to this complaint, Stericycle operated a medical waste removal service in Alabama for the Plaintiffs and others.

## JURISDICTION AND VENUE

10.    Pursuant to ALA. CODE §§ 6-3-7 and 12-12-30, this judicial district is the proper jurisdiction and venue for this action because a substantial part of the events or omissions giving rise to the claims occurred in Tallapoosa County and the matter in controversy exceeds $10,000, exclusive of interest and costs. Plaintiffs are physically located in this county and entered into contracts with Stericycle from this county. This Court has personal jurisdiction over the Defendant because Defendant has sufficient minimum contacts with Alabama. Defendant avails itself of the privilege of conducting business in Alabama through medical waste removal and transportation services sufficient to render the exercise of personal jurisdiction by this Court consistent with traditional notions of fair play and substantial justice.

## FACTS

### A.  Stericycle

11.  Stericycle has been in the medical waste business since 1989. As Stericycle explains on its website,[2] medical waste includes "any solid waste that is generated in the diagnosis, treatment, or immunization of human beings or animals." It includes but is not limited to items that are freely dripping liquid or semi-liquid blood or "potentially infectious materials" or could readily release infectious materials if compressed, items containing dried blood or "potentially infectious materials" that could release flakes if compressed or otherwise handled, human blood and blood products, hemodialysis waste of all items that were in contact with a patient's blood (tubing, filters, towels, gloves, aprons, lab coats) and any other contaminated disposable equipment, human or animal isolation wastes, sharps waste, surgery or autopsy tissue, organs, or body parts, surgical and autopsy wastes, cultures or stocks of any virus, bacterium or other organism including discarded live attenuated vaccines and the items used to transfer, inoculate or mix cultures, tissues, organs, body parts, bedding, carcasses, and body fluids from experimental animals, teeth in dentistry, laboratory wastes that have been in contact with infectious wastes, discarded medical equipment and its components that have been in contact with infectious agents, any other discarded item or waste that an administrator believes poses a threat to human health or the environment, potentially infectious body fluids. Stericycle's waste-related services include waste pickup and disposal.

---

[2]*See* http://www.stericycle.com/compliance/tools-and-resources/faqs/medical-waste/

12.     Stericycle serves more than 1,000,000 customers worldwide (as of 2016). It divides its customers into two categories: large-quantity and small-quantity waste generators. Large-quantity waste generators include hospitals, blood banks, and pharmaceutical manufacturers. Small-quantity waste generators include medical practices, outpatient medical clinics, medical and dental offices, long-term and subacute care facilities, veterinary offices, retail pharmacies, and other similar entities. The vast majority of Stericycle's customers are small-quantity or "SQ" customers. PriCare and Temple were both SQ customers.

13.     When Stericycle engages with a new small-quantity customer, it offers the customer a standard form Steri-Safe Contract. It provides for monthly or quarterly waste pick-ups. PriCare and Temple both signed the Steri-Safe Contract.

14.     The term of the Steri-Safe Contract is typically 36 to 60 months from the effective date. To prevent automatic renewal, the customer must give 60 days' written notice of intent to terminate the agreement, and the notice must be made during the six-month period prior to the renewal date.

15.     If a customer terminates the Steri-Safe Contract prior to expiration of the term, Stericycle contends it has the right to recover from the customer liquidated damages in an amount equal to 50% of the customer's average monthly charge multiplied by the number of months remaining on the term.

16.     The Steri-Safe Contract is governed by Illinois law.

17.     The Steri-Safe Contract originated from Stericycle's offices in Illinois. Stericycle's officers execute the Steri-Safe Contracts from Illinois.

DOCUMENT 2

18.    At all times relevant to this action, Stericycle issued invoices to PriCare and Temple from its Illinois offices. Stericycle further directed that payment of those invoices be sent to its offices in Illinois.

19.    Any customer, including PriCare and Temple, wishing to terminate its contract with Stericycle must communicate with Stericycle personnel in Bannockburn, Illinois.

20.    Customers typically pay Stericycle a flat fee on a monthly or quarterly basis. The flat fee is listed on the cover page of the Steri-Safe Contract.

21.    Stericycle may increase the monthly or quarterly flat fee only under limited conditions during the term of the contract:

> Stericycle reserves the right to adjust the contract price to account for operational changes it implements to comply with documented changes in law, to cover increases in the cost of fuel, insurance, residue disposal, or to otherwise address cost escalation.

22.    Despite these limitations under which Stericycle may increase its fees, Stericycle has engaged in a systematic and deliberate practice of raising its fees based on annual automated price increases ("API") of 18% on Steri-Safe Contract customers. These predetermined price increases were unconscionable, deceptive, fraudulent, improper, and just plain wrong because they bear no relationship to Stericycle's "operational changes," "documented changes in the law," or "cost escalation."

23.    Stericycle implemented its API scheme from its headquarters in Illinois.

24.     Stericycle's Vice President of Sales Operations explained automated price increases as follows:

> Q. ...what's your understanding of the term "automated price increase"?
>
> A. Automated price increase is a system-generated price increase that's applied to the customer's pricing.
>
> Q. And for small quantity customers who have not -- whose contract does not specifically state what their future pricing is going to be, unless that customer is for some reason exempted from the automated price increase process, those price increases are imposed on the customer by a function of Stericycle's billing system; is that right?
>
> A. Yes.

Deposition of James Edward Buckman, pp. 30-31. He continued:

> Q. During your time at Stericycle it's been true, hasn't it, that the standard automated price increase percentage for small quantity customers was 18 percent?
>
> A. Yes.

*Id.* at 32.

25.     Stericycle uses (or has used) an electronic financial accounting and reporting system named "Tower." The automated price increase process is built into the Tower system, but the intervals at which Stericycle has imposed API has varied. Stericycle modulated the timing of the API in order to meet revenue targets – there was no connection to actual cost increases that might justify a price increase. Automated Price Increases are a major revenue source for Stericycle.

26.     Stericycle's costs fluctuate and do not uniformly increase from year-to-year, but Stericycle does not modify the API to reflect these fluctuations. Stericycle

8

does not internally correlate the API to its own costs. Stericycle's costs do not increase 18% every nine or twelve months.

27. In a deposition, Mr. James Edward Buckman (Stericycle's Vice President of Sales Operations) conceded that automated price increases are implemented to make sure that Stericycle achieves the revenue numbers it has predicted. The increases bear no relation to actual costs. In the words of Mr. Buckman:

> Q. And what about, have you ever heard mention of needing to increase revenue in order to meet the revenue forecasts that Stericycle gives to the investment community?
>
> A. I would say that's part of our internal goal. That's related to our internal goal.
>
> Q. ....you're concerned more with meeting revenue targets rather than being concerned about the cost of providing services or products to Stericycle's customers; isn't that right?
>
> A. That is the primary focus of the sales and marketing organization.
>
> Q. So, you are given a revenue goal and you figure out how to meet that goal, but in making decisions in order how to do that, you don't specifically consider Stericycle's cost of, you know, how much it cost to provide services to any specific customer or type of customer; isn't that right?
>
> A. I don't understand the question.
>
> Q. Well, I think you said it's another part of Stericycle's organization that keeps track of the cost of providing goods and services to customers, right?
>
> A. Correct.
>
> Q. You are given a revenue target or a revenue goal that you are expected to meet along with your colleagues, and you come up with initiatives in ways that you think that you can meet that goal, correct?
>
> A. Correct.

Q. But when you are making decisions about specific initiatives, such as changing the frequency of automated price increases, you don't go back and look and say, hey, how much is – you know, how much is it costing us to dispose of medical waste, how much are we paying for labor or any other specific cost factors when you are making those revenue decisions, do you?

A. Not specifically.

Q. You -- because from your point of view, whatever decisions there are about maintaining gross margins, those are made in setting the goal of revenue that you are expected to generate, right?

A. Right.

Q. So, when you are deciding whether to change the frequency of automated price increases, you don't need to go back and look at those cost figures; all you need to do is make sure you hit your revenue numbers in order to make sure you keep your margins, right?

A. In my role, yes.

Deposition of James Edward Buckman, pp. 68-70.

28.   The price increases that Stericycle imposed on small-quantity customers such as PriCare and Temple can be determined from the electronic records contained in Stericycle's financial reporting systems.

29.   Stericycle concealed the API algorithm. When Stericycle imposes API, it issues an invoice to the customer for the new inflated flat fee without explanation. This makes it difficult, if not impossible for customers to discover that their fee increases were unjustified.

30.   Since 2004, Stericycle has known that several governmental authorities consider API to be an improper practice. These authorities include New York City, the State of New Jersey, and the State of Washington. Based on their

DOCUMENT 2

objections, Stericycle has formulated a written policy forbidding the use of API within those jurisdictions.

31.     Stericycle executives have been aware that the federal government objected to API. In September of 2006, Stericycle's Vice President, Patrick Cott, sent an email to his subordinates directing them to stop charging API to federal government customers. Nevertheless, Stericycle continued to impose API on its small-quantity private sector customers.

32.     Stericycle's deceptive actions have also been the subject of a large *qui tam* suit which only recently completed. The suit was brought by relator Jennifer Perez, a government customer relations specialist with Stericycle between 2004 and 2008.[3] Ms. Perez discovered that Stericycle was routinely imposing 18% price increases annually and even more often on customers with long-term fixed rate contracts that prohibited price increases or allowed increases only to address certain costs in servicing Stericycle's customers. According to Ms. Perez, her supervisors routinely admitted to her they were aware that Stericycle's APIs were improper.

33.     On April 28, 2008, Perez filed a *qui tam* complaint against Stericycle. She alleged that Stericycle defrauded the United States, 14 states, and the District of Columbia by imposing API in violation of its contracts. Ms. Perez further alleged, "Stericycle fails to inform its customers that despite the contract price it has agreed

---

[3] *See, e.g., United States v. Stericycle, Inc.*, No. 08 C 2390, 2016 WL 369192, at *2 (N.D. Ill. Feb. 1, 2016).

to, Stericycle intends to and adds unallowable surcharges to each bill, in addition to an undisclosed 18% across the board increase every 9 months."

34.    On January 2, 2013, Stericycle settled the case initiated by Ms. Perez with the Attorney General of New York. In the Settlement Agreement, Stericycle admitted that during the period January 1, 2003, through September 30, 2012, it had presented invoices containing API which was not authorized by the contracts.

35.    The $2.4 million Settlement Agreement between Stericycle and New York provides that Stericycle will reimburse the state for 100% of the charges resulting from API. In addition, Stericycle agreed to pay treble damages to New York as a result of the API. That settlement did not provide any relief for the Plaintiffs, PriCare and Temple.

36.    On February 1, 2016, United States District Court Judge William T. Hart granted a motion by Ms. Perez for the consent of the court for voluntary stipulation of dismissal of the *qui tam* action.

37.    Stericycle has also reached a settlement in a class action involving more than 180,000 SQ customers.[4] Stericycle has agreed to pay nearly $300,000,000 in damages to class members as a result of its fraudulent practices.

38.    PriCare and Temple opted out of the class because they did not want to be forced to continue in their business relationships with Stericycle, as the settlement would require, and because the potential compensation they would

---

[4] *See* Doc. 382 in *In Re: Stericycle, Inc. Steri-Safe Contract Litigation*, Case No. 1:13-cv-05795, MDL No. 2455 (N.D. Ill. Mar. 8, 2018).

receive is in no way representative of the damage PriCare and Temple suffered as a result of Stericycle's deceptive business practices.

39.     Plaintiff's experiences with Stericycle mirror the wrongful practices described in the *qui tam* action and the Stericycle class action.

**B.     Stericycle's unlawful business practices with PriCare**

40.     In or about March 2008, PriCare entered into a Steri-Safe Service Agreement with Stericycle. Stericycle induced PriCare to sign its original contract by representing to it that the contract would be a fixed rate contract.

41.     Stericycle knew it would not charge PriCare a "flat fee" for its services when it presented the Steri-Safe Contract to PriCare.

42.     The March 2008 Steri-Safe Service Agreement provided that Stericycle's waste pickup services would cost $110 per month. By late 2010, Stericycle was consistently billing PriCare for nearly $200 per month, an increase of more than 80% in two short years. This would turn out to be just the beginning of Stericycle's fraudulent business practices.

43.     In December 2010, PriCare executed a second agreement with Stericycle, in which it contracted for waste removal services at a cost of $275 per month. By December 2012, PriCare was paying more than $500 per month for the same services. By December 2014, the price had increased to $1,047.34 per month— nearly quadruple the rate PriCare had agreed to pay in its Steri-Safe contract in December 2010.

44.     In December 2015, PriCare paid $1,442.64—an increase of nearly 40% from the previous year. By March 2017, Stericycle was charging $1,993.05 for the

same medical waste removal services for which it charged $275.00 just six years earlier, a more than seven-fold increase. In total, Stericycle increased its monthly charges to PriCare, for the same service, by nearly 1600% between March 2008 and March 2017.

45.    Throughout PriCare's dealings with the Defendant, Stericycle implemented improper and unlawful price increases and overcharges, including price increases resulting in an unjustified multiplying of PriCare's costs. Because the price increases were presented in the form of general invoices—and because Stericycle representatives presented bogus justifications for the prices increases—it was impossible for Temple to uncover the fraudulent nature of Stericycle's API scheme until after it terminated its Steri-Safe contract.

46.    None of Stericycle's price increases has been proper or justified under Stericycle's contract with PriCare.

47.    Upon information and belief, Stericycle representatives working in Illinois actively concealed the true reasons for its price increases from PriCare, making it impossible for PriCare to discover Stericycle's API scheme until after PriCare terminated the Steri-Safe Contract.

### C.    Stericycle's unlawful business practices with Temple.

48.    Upon information and belief, Temple first entered into a Steri-Safe Service Agreement with Stericycle in or before June 2010. As of June 2010, Stericycle charged Temple $1,289.25 per month for weekly pickups.

49.    By June 2012, Stericycle was charging Temple $1,845.55 per month for the same service, a more than 40% increase in just two years.

50.    On or about January 1, 2014, Stericycle induced PriCare to sign a renewed Steri-Safe contract by representing to it that the contract would be a fixed rate contract.

51.    Stericycle knew it would not charge Temple a "flat fee" for its services when it presented the Steri-Safe Contract to Temple.

52.    The January 2014 Steri-Safe Agreement provided that Temple's "flat monthly fee" would be $1,449.06. Stericycle, however, increased Temple's bill to $1789.14 in December 2014. By February 2016, Temple's "flat monthly fee" had risen to $2,033.83, another 40% increase in two years for what should have been a "flat monthly fee." Temple terminated its Steri-Safe Contract in or about April 2016.

53.    Despite its fraudulent and deceptive business practices and repeated breaches of the Steri-Safe Contract, and as part and parcel with its predatory treatment of its customers, Stericycle has attempted to impose liquidated damages upon Temple for terminating the Steri-Safe Contract.

54.    Throughout Temple's dealings with the Defendant, Stericycle implemented improper and unlawful price increases and overcharges, including price increases resulting in an unjustified multiplying of Temple's costs. Because the price increases were presented in the form of general invoices—and because Stericycle representatives presented bogus justifications for the prices increases—it was impossible for Temple to uncover the fraudulent nature of Stericycle's API scheme until after it terminated its Steri-Safe contract.

55.     None of Stericycle's price increases has been proper or justified under
Stericycle's contract with Temple.

56.     Upon information and belief, Stericycle representatives working in
Illinois actively concealed the true reasons for its price increases from Temple,
making it impossible for Temple to discover Stericycle's API scheme until after
Temple terminated the Steri-Safe Contract.

### CAUSES OF ACTION

### COUNT I

**Violations of the Illinois Consumer Fraud and Deceptive Business
Practices Act, 815 ILCS § 505/1, *et seq.*, and Ilinois Deceptive Trade
Practices Act, 815 ILCS § 510/2**

57.     Stericycle engaged in unfair or deceptive acts or practices by imposing
automated price increases and charging undisclosed fees. Stericycle knew that its
practice was not authorized by its contracts with Plaintiffs, but it nevertheless used
various forms of pressure and trickery to force Plaintiffs to pay as much of the API
as possible.

58.     Stericycle further engaged in unfair or deceptive acts or practices by
knowingly or willfully concealing, suppressing, or omitting material facts from
Plaintiffs and by making affirmative misrepresentations in order to induce
Plaintiffs to enter into medical waste disposal contracts and/or remain Stericycle
customers. Stericycle's scheme included concealing that its agreements were not
actually fixed-price agreements, and that it used an automated price increase
algorithm in its computer system to automatically increase its charges to Plaintiffs,
lying to Plaintiffs about the rates that they had been and would be charged by

Defendant, issuing invoices to Plaintiffs reflecting prices greater than those authorized by their contracts and without notice of the price increase, giving fabricated and misleading rationales for price increases, offering discounts on APIs only to complaining customers and only if they threatened to cease using Stericycle's services, and imposing APIs on customers even after agreeing to reduce the contract price following customer complaints. Stericycle's material misstatements and omissions were likely to and did in fact deceive reasonable customers, including Plaintiffs, about Stericycle's services and the prices they would be and were in fact charged.

59.    Plaintiffs would have acted differently if they had known that Stericycle imposed the APIs described in this complaint, since such information would have been a material consideration of a buyer in making a decision whether to acquire the waste disposal services of Stericycle. For instance, Plaintiffs would have wanted to know, as would any reasonable person, that Stericycle imposes automated price increases that bear no relation to its actual costs. Such information would have changed the decision of Plaintiffs and any other prospective customer to use Stericycle's services. Plaintiffs would have wanted to know that the charges on the invoices issued by Stericycle would not accurately reflect the amount Plaintiffs were contractually obligated to Stericycle, and would not have paid the excess charges had it known the truth.

60.    Stericycle intended that Plaintiffs would rely on its misrepresentations as well as the material facts that it concealed, suppressed and omitted, as described

above. Among other things, Stericycle intended that Plaintiffs rely upon its representations that its regulated medical waste disposal fees would be fixed for the term of the contract other than increases for the limited reasons specifically described in its Steri-Safe Contract. Stericycle also intended for Plaintiffs to rely upon the Stericycle invoices as being true and accurate statements of amounts properly owing, as well as upon the other statements made by Stericycle in attempting to justify price increases. Plaintiffs relied upon Stericycle's fraudulent and misleading statements, concealments, suppressions, and omissions, and as a result paid significantly greater amounts than it would have paid absent Stericycle's wrongful conduct.

61.     Through its acts described herein, including without limitation, Stericycle's use of API, its misrepresentations of its sales representatives in the marketing and selling its services, and various provisions of the Steri-Safe Contract, Stericycle violated the Illinois Consumer Fraud and Deceptive Business Practices Act and the IDTPA. Stericycle's acts and omissions constitute unconscionable, false, misleading, and deceptive acts and practices in the conduct of trade and/or commerce.

62.     Stericycle's unfair or deceptive acts or practices occurred in the course of conduct involving trade or commerce, and was directed to the market in general. The complained-of conduct in this case implicates consumer protection concerns.

63.     Stericycle's conduct is a violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510/2. As a violation of Section 2 of the Illinois

Uniform Deceptive Trade Practices Act, Stericycle's conduct is a violation of Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/2.

64.     Stericycle's unfair or deceptive acts or practices proximately caused injury and ascertainable loss to Plaintiffs.

65.     As a result of its acts and omissions, Stericycle is liable to Plaintiffs for actual damages, treble damages, attorneys' fees, costs, and any other relief the Court deems proper.

**COUNT II**

**Fraudulent Inducement**

66.     Stericycle had a duty to be truthful to Plaintiffs in its representations as to the fee structure by which it would charge Plaintiffs for services, including the reasons for which it could justifiably increase prices.

67.     When it presented the Steri-Safe Contract to Plaintiffs, Stericycle made false representations of material fact as to when, why, and by how much it would increase Plaintiffs' service charges, intending that Plaintiffs would rely on these misrepresentations and execute the Steri-Safe Contracts.

68.     Plaintiffs reasonably relied on these representations in entering into their business relationships with Stericycle.

69.     As a proximate result of Stericycle's false representations, Stericycle damaged Plaintiffs and is liable to Plaintiffs for compensatory and punitive damages, costs, and any other relief the Court deems proper.

## COUNT III

### Fraud—Automated Price Increases

70.     Stericycle made false representations as to the automated price increases and other material elements of the Steri-Safe contract as described above.

71.     Plaintiffs reasonably relied upon those representations when entering into and continuing its business relationship with Stericycle, including paying unjustified and exorbitant fees based on Stericycle's false representations and fraudulent practices.

72.     As a proximate result of Stericycle's false representations and fraudulent practices, Stericycle damaged Plaintiffs and is liable to Plaintiffs for compensatory and punitive damages, costs, and any other relief the Court deems proper.

## COUNT IV

### Fraudulent Suppression

73.     Stericycle had a duty to disclose existing material facts related to its Steri-Safe Contracts with Plaintiffs, including that it would impose automatic price increases and that Plaintiffs' costs would actually be significantly more than the amounts set forth in the contracts.

74.     Stericycle had knowledge of these material facts.

75.     Through the actions described above, Stericycle suppressed these material facts and presented bogus explanations which were unrelated to and hid the true nature of the unjustified price increases it imposed upon Plaintiffs.

76.     Stericycle's suppression of these facts induced Plaintiffs to continue their business relationships with Stericycle and pay the unjustified price increases and fees described above.

77.     As a proximate result of Stericycle's suppression of material facts, Stericycle damaged Plaintiffs and is liable to Plaintiffs for compensatory and punitive damages, costs, and any other relief the Court deems proper.

## COUNT V

### Breach of Contract

78.     Plaintiffs entered into valid binding contracts with Stericycle.

79.     Plaintiffs performed under the contracts.

80.     Through its acts and omissions described in this Complaint, Stericycle breached its contracts with Plaintiffs.

81.     As a result of Stericycle's acts and omissions, Stericycle damaged Plaintiffs and is liable to Plaintiffs for compensatory damages, costs, and any other relief the Court deems proper.

## COUNT VI

### Unjust Enrichment/Money Had and Received

82.     Plaintiffs conferred a benefit on Stericycle by hiring and paying Stericycle for waste-related services.

83.     By its actions as described in this Complaint, Stericycle has been unjustly enriched at Plaintiffs' expense and has retained money that should be returned to Plaintiffs.

DOCUMENT 2

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek judgment in their favor and against Stericycle including, at least:

A.    Declaring that Stericycle's practice of charging Plaintiffs automated price increases breached the Steri-Safe Contracts between Plaintiffs and Stericycle and was wrongful;

B.    Declaring that the Steri-Safe Contracts between Plaintiffs and Stericycle are voidable and unenforceable;

C.    Awarding Plaintiffs compensatory damages caused by Defendant's unfair, fraudulent or deceptive practices;

D.    Awarding treble damages to Plaintiffs;

E.    Awarding pre-judgment and post-judgment interest to Plaintiffs at the maximum rate permitted by applicable law;

F.    Awarding Plaintiffs' attorneys' fees and costs and expenses incurred in connection with this action; and

G.    Such other and different relief as the Court deems just and proper.

### PLAINTIFF DEMANDS TRIAL BY JURY.

Respectfully submitted on July 9, 2018.

s/ Benjamin B. Coulter
Edward L. Hardin, Jr. (HAR097)
Anthony C. Harlow (HAR197)
Benjamin B. Coulter (COU027)
Jacob A. Burchfield (BUR206)

Attorneys for Plaintiffs
PRICARE PA &
TEMPLE MEDICAL CLINIC, PC

**OF COUNSEL:**

BURR & FORMAN LLP
420 North 20th Street, Suite 3400
Birmingham, Alabama 35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100
ehardin@burr.com
tharlow@burr.com
bcoulter@burr.com
jburchfield@burr.com

Taylor A. Pharr (TAP005)

*Attorney for Plaintiffs*
PRICARE PA &
TEMPLE MEDICAL CLINIC, PC

MORRIS HAYNES LAW FIRM, LLP
131 Main Street (35010)
PO Box 1660
Alexander City, AL 35011-1660
Telephone: (256) 329-2000
Facsimile: (256) 329-2015
tpharr@mhhlaw.net

**PLEASE SERVE BY CERTIFIED MAIL AS FOLLOWS:**

**Stericycle, Inc.**
c/o CT Corporation System
2 North Jackson Street, Ste. 605
Montgomery, AL 36104

*s/ Benjamin B. Coulter*
OF COUNSEL